# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

| | | |
|---|---|---|
| **BRANDON L. JONES, #615986,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:20-cv-00009** |
| | ) | **Chief Judge Crenshaw / Frensley** |
| **SAMANTHA McLERRAN, et al.,** | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION AND BACKGROUND

This matter is before the Court upon two Motions for Summary Judgment: the first, filed by Defendant Samantha McLerran, M.D. (Docket No. 70); and the second, filed by Defendant Daniel Trivette (Docket No. 76).

### A.    Defendant McLerran's Motion for Summary Judgment

On September 29, 2021, Defendant Samantha McLerran, M.D., filed a Motion for Summary Judgment, with Exhibits. Docket Nos. 70 – 70-5. Specifically, Defendant McLerran has filed the Affidavit of Cookeville Police Department Officer Benjamin Dukes, excerpts from Plaintiff's Deposition, the relevant search warrant, and her own Affidavit, and her Statement of Undisputed Material Facts. Docket Nos. 70-1 – 70-5. Additionally, Defendant McLerran has filed a supporting Memorandum of Law and another copy of her Statement of Undisputed Material Facts. Docket No. 71, 72.

Plaintiff has filed two identical copies of his Response to Defendant McLerran's Motion, one, filed October 20, 2021 and the other, filed October 25, 2021. Docket No. 73, 74. Plaintiff, however, has not responded to Defendant McLerran's Statement of Undisputed Material Facts.

On October 26, 2021, Defendant McLerran filed a Reply. Docket No. 75.

As grounds for her Motion, Defendant McLerran argues;

There is no dispute that her digital examination of Plaintiff's rectum to search for contraband on July 29, 2019, was conducted in a safe, hygienic, medically necessary manner in [a] private medical facility, using standard techniques and procedures designed to protect patient privacy and safety, pursuant to a facially valid warrant signed by a neutral and detached magistrate and after consultation with hospital counsel. As such, Dr. McLerran's examination of Jones did not violate any clearly established law, and she is entitled to qualified immunity from suit. Alternatively, Jones cannot carry his burden at trial of establishing that his Fourth Amendment rights were violated, and thus Dr. McLerran is also entitled to judgment as a matter of law on Jones's civil rights claims under 42 U.S.C. §1983 for lack of evidence to support his theories.

Docket No. 70.

Defendant McLerran argues that the Court should grant her Motion because (1) her digital examination of Plaintiff's rectum was pursuant to a facially valid search warrant and did not violate any clearly established law such that she is entitled to qualified immunity from suit; and (2) Plaintiff is unable to carry his burden of establishing that his rights were violated such that Defendant McLerran is entitled to judgment as a matter of law on Plaintiff's §1983 claims. Docket No. 71. Defendant McLerran contends that the issuance of the search warrant simplifies the question of the constitutional validity of the digital examination because search warrants protect against unreasonable searches by ensuring that the decision to search is made "by a neutral and detached magistrate" instead of at the discretion of a law enforcement officer. *Id.* She further contends that physicians must defer to a magistrate even more than law enforcement officers because physicians have no training or information to be able to question the determinations made by the magistrate in issuing the warrant and are not required to have knowledge of search and seizure laws. *Id.*

With regard to whether the amount of "force" used in conducting the digital rectal examination was unreasonable and unconstitutionally excessive, Defendant McLerran maintains

that Plaintiff must produce objective evidence to support his claim. *Id.* She contends that Plaintiff has failed to do so. *Id.* Defendant McLerran argues that she performed a medically necessary digital examination of Plaintiff's rectum, pursuant to a facially valid search warrant, and she contends that her digital examination was less invasive than using an anoscope, based on her discovery of poorly wrapped narcotics in his gluteal cleft and her judgment regarding the lethal risks of pack rupture in an "uncertain [] and rapidly evolving" situation in which Plaintiff had several grams of methamphetamine in his gluteal cleft. *Id.* Defendant McLerran notes that there is no record evidence that Plaintiff suffered any lasting physical injury caused by the examination. *Id.* She contends that her medical judgment in that moment is entitled to the Court's deference, even if the Court, reviewing the record today, believes that it would have made a different decision at the time. *Id.*

As to Plaintiff's suggestion that an x-ray would have been a sufficient alternative to a digital rectal search, Defendant McLerran responds that Plaintiff, as a lay person, is not qualified to opine about when an x-ray is necessary or what it would show. *Id.* Defendant McLerran notes that Plaintiff's testimony about an x-ray satisfying the search is inadmissible speculation because lay witnesses cannot testify to opinions that require scientific, technical, or other specialized knowledge. *Id.* She argues that Plaintiff has therefore failed to create a genuine issue of material fact on this issue, and she reiterates that she is entitled to qualified immunity. *Id.*

With respect to Plaintiff's §1983 claims, Defendant McLarren argues that "the record is devoid of competent proof to make out a *prima facie* §1983 claim for either an unreasonable search or excessive force," such that Plaintiff cannot prevail and she is entitled to a judgment as a matter of law. *Id.*

Defendant McLerran summarizes:

There is no genuine dispute that she acted pursuant to a facially valid search warrant and out of concern for the risk of lethal overdose after finding a poorly wrapped bag of white powder in [Plaintiff's] gluteal cleft. Further, there is no genuine dispute that she conducted the search in a hospital and that she used lubricant, a glove, and proper medical technique. Under these circumstances, Dr. McLerran's actions did not violate any constitutional rights, much less any clearly established constitutional rights. Accordingly, Dr. McLerran is entitled to qualified immunity and [Plaintiff's] evidence is insufficient to establish a violation of a constitutional right necessary to support a claim under 42 U.S.C. §1983.

*Id.*

Plaintiff in his two identical Responses, argues he is "entitled to relief pursuant to Rule (8) of the Fed. R. Civ. P." because he has "stated facts and claims with specificity" and "given Defendant McLarran [*sic*] fair notice of what [his] claims are and the grounds upon which they rest." Docket Nos. 73, 74. Plaintiff further argues that Defendant McLerran acted under color of law and deprived him of his Fourth and Eighth Amendment rights. *Id.* Plaintiff argues that the "search warrant at issue, allowing the Defendants to perform a cavity search on Plaintiff, was based on an unlawful stop, search, seizure, and insufficient probable cause." *Id*. Plaintiff argues, therefore, that Defendant McLerran lacked probable cause and a legally valid search warrant, such that she is not entitled to qualified immunity. *Id.*

Plaintiff's Responses essentially restate the arguments he made in response to Defendant McLarren's earlier Motion to Dismiss, even going so far as to argue, "When considering a motion to dismiss under Fed. R. Civ. Proc. 12(b)(1)…." *Id.*, p. 5. Plaintiff adds that the allegations of his Amended Complaint are sufficient to present genuine issues of material fact that should defeat Defendant McLarren's Motion for Summary Judgment. *Id.*

In her Reply, Defendant McLerran incorporates the arguments set forth in her Response, and further replies that, in order to defeat her Motion for Summary Judgment, Plaintiff may not rest solely on the allegations from his pleadings, but rather, must present specific facts showing

that there is a genuine issue for trial. Docket No. 75. Defendant McLerran argues that Plaintiff has failed to do so. *Id.* Defendant McLerran maintains that Plaintiff cites nothing in the record to support his claims, and argues that Plaintiff's Response "fails to meaningfully dispute—or even address—the material facts supporting [her] Motion." *Id.*

Defendant McLerran further replies that Plaintiff utterly failed to respond to her Statement of Undisputed Material Facts and that because Plaintiff did not respond to her Statement of Undisputed Material Facts, pursuant to the Federal and Local Rules, those facts are deemed admitted such that there is no genuine issue of material fact. *Id.*

With regard to qualified immunity, Defendant McLerran argues that Plaintiff fails to cite any law clearly establishing a right to be free from a digital rectal examination performed in an "unspecified 'rough manner.'" *Id.* She continues, "So, in addition to offering no record evidence in support of his claims, [Plaintiff's] latest brief also fails to cite *any* law to overcome the authorities" cited. *Id.* Defendant McLerran contends, therefore, that Plaintiff has failed to establish that the digital rectal search violated any clearly established right, such that she is entitled to qualified immunity and summary judgment. *Id.*

## B. Defendant Trivette's Motion for Summary Judgment

On November 19, 2021, Defendant Daniel Trivette filed his Motion for Summary Judgment and supporting materials. Docket Nos. 76-78. Specifically, Defendant Trivette has filed his Motion; his Declaration and the Declarations of Defendant McLerran, Benjamin Dukes, Craig Ragsdale; excerpts from Plaintiff's Deposition; certified copies of Plaintiff's guilty pleas, convictions, and case dismissals; the transcript of excerpts of body camera video recordings; a supporting Memorandum of Law; and a Statement of Undisputed Material Facts. *Id.*

Plaintiff has not responded either to Defendant Trivette's Motion or Statement of

Undisputed Material Facts, nor has he filed his own Statement of Undisputed Material Facts.

As grounds for his Motion, Defendant Trivette argues that his only involvement was stopping the vehicle Plaintiff was driving, transporting Plaintiff to the Putnam County Jail and from the Putnam County Jail to the Cookeville Regional Medical Center Emergency Department, remaining present during the search by Defendant McLerran for security purposes, holding down Plaintiff's right leg during the digital rectal search at the request of Defendant McLerran, and transporting Plaintiff back to Putnam County Jail. Docket No. 76. Defendant Trivette argues that he had limited involvement and that none of his actions violated Plaintiff's constitutional rights. *Id.* He argues that, in the alternative, he is entitled to qualified immunity because his actions did not violate any clearly established constitutional right of Plaintiff. *Id.* As additional alternative grounds, Defendant Trivette maintains that Plaintiff's claim is barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) because Plaintiff admitted that the criminal charges arising from the methamphetamine that he had secreted in his body were dismissed as part of a plea bargain where he pled guilty to other charges. *Id.* Defendant Trivette argues that, accordingly, if this case were to proceed, it would, of necessity, invalidate Plaintiff's plea bargain. *Id.*

As has been noted, Plaintiff has not responded either to Defendant Trivette's Motion or Statement of Undisputed Material Facts, nor has he filed his own Statement of Undisputed Material Facts.

### C.    Background Allegations of Plaintiff's Amended Complaint

Plaintiff, an inmate housed at the Lois M. DeBerry Special Needs Facility ("DSNF"), filed his Amended Complaint in this pro se, in forma pauperis action on July 16, 2020, alleging that Defendants have violated his Fourth and Eighth amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 28.  Plaintiff avers as follows:

6

On July 29, 2019, Plaintiff was pulled over by Cookeville Police Officer Daniel Trivette for a burnt-out license plate light. *Id.* Defendant Trivette searched his vehicle and found a meth pipe. *Id.* Upon the discovery of the meth pipe, Defendant Trivette detained Plaintiff and called for police backup. *Id.* Arriving officers patted Plaintiff down. *Id.* One of the officers who patted Plaintiff down stated that he felt something in Plaintiff's buttocks region. *Id.* Defendant Trivette then looked inside the back of Plaintiff's pants and saw nothing, but informed Plaintiff that he had outstanding "active" warrants pending from 2004 and 2018. *Id.* After informing Plaintiff of his outstanding warrants, Defendant Trivette arrested Plaintiff and placed him the back of his patrol car. *Id.* Defendant Trivette then transported Plaintiff to the Putnum County Jail. *Id.* Once at the Jail, Plaintiff was subject to another pat down search and a strip search where Plaintiff was told to "squat and cough." *Id.* Plaintiff was ordered to repeat the "squat and cough" procedure approximately eight times. *Id.* Plaintiff was allowed to put his clothes back on and was held in custody. *Id.* Defendant Trivette then informed Plaintiff that he was going to secure a search warrant to force Plaintiff to submit to a digital cavity search of his rectum. *Id.*

Defendant Trivette returned to the Jail approximately two hours later with a search warrant to conduct a digital search of Plaintiff's rectum. *Id.* Defendant Trivette then transported Plaintiff in custody to the Cookeville Regional Medical Center. *Id.* Once Plaintiff arrived at the hospital in custody, he was taken to Room 233, where he was handcuffed to the hospital bed. *Id.* Plaintiff remained guarded by Cookeville police officers and a hospital security guard. *Id.* Shortly thereafter, Dr. Samantha McLerran, M.D. entered the room with a nurse. *Id.* Plaintiff's vitals were taken by the nurse and Defendant McLerran. *Id.* Plaintiff was instructed to take his pants off and he complied. *Id.* Plaintiff was then ordered to lie on a table and roll over on his left side. *Id.* Defendant McLerran spread Plaintiff's butt cheeks and found two small plastic packages of a white

powder, which turned out to be drugs. *Id.*

Once the packages of drugs were found hidden in Plaintiff's butt cheeks, Defendant McLerran instructed the hospital security guard to hold Plaintiff down. *Id.* The hospital security guard, John Doe #1, held Plaintiff's right side and Defendant Trivette held Plaintiff's left side. *Id.* Plaintiff saw Defendant McLerran putting a lubricant on her gloved hand and pleaded with her not to digitally penetrate his rectum. *Id.* Plaintiff repeatedly requested that Defendant McLerran give him an x-ray instead of digital penetration, but Defendant McLerran refused. *Id.* Plaintiff asserted that he didn't have any drugs or contraband inside his rectal canal. *Id.* Defendant McLerran "thrust her gloved fingers inside Plaintiff's rectum, in rough manner that caused Plaintiff considerable physical pain, and emotional pain and suffering." *Id.* Defendant McLerran did not find any drugs or other foreign objects in Plaintiff's rectum. *Id.* Defendant McLerran "refused to clean Plaintiff's rectum area before she left the room. Plaintiff was left soiled with lubricant jelly and fecal matter in his rectal area." *Id.*

Plaintiff asserts that he suffered "physical pain and suffering, and emotional pain and suffering." *Id.* Plaintiff sues Defendants in their individual and official capacities, seeking compensatory and punitive damages. *Id.*

For the reasons set forth below, the undersigned finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. The undersigned therefore recommends that Defendants' Motions for Summary Judgment (Docket Nos. 70, 76) be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE**.

## II. Undisputed Facts[1]

---

[1] Unless otherwise noted, the following Facts are in a form required by Fed. R. Civ. P. 56 and are undisputed.

On or about midnight, July 28-29, 2019, Defendant Trivette initiated a traffic stop after observing a vehicle driving without functioning license plate illumination. Docket No. 76-3, Declaration of Daniel Trivette ("Trivette Dec."), ¶ 2. When Defendant Trivette approached the vehicle, he identified the driver as Plaintiff Brandon Jones. *Id.*, ¶ 3. Defendant Trivette, Officer Dukes, and Officer Ragsdale noticed that Plaintiff was sweating profusely, shaking, and acting nervous. Trivette Dec., ¶ 3; Docket No. 76-4, Declaration of Benjamin Dukes ("Dukes Dec."), ¶ 3; Docket No. 76-5, Declaration of Craig Ragsdale ("Ragsdale Dec."), ¶ 3. Plaintiff could not produce the vehicle registration and said that he had borrowed the vehicle from a friend. Trivette Dec., ¶ 3. Plaintiff had just borrowed the car for the first time from Jamie White, the vehicle's owner. Docket Nos. 70-2; 76-6, Excerpts from the Deposition of Brandon Jones ("Plaintiff's Dep."), at 17:6-9; 18:12-18; 24-25. Plaintiff refused consent to search the vehicle. Dukes Dec., ¶ 4. Defendant Trivette took Plaintiff's driver's license back to his patrol car to check for warrants. Trivette Dec., ¶ 3.

Shortly after initiating the traffic stop, Officer Craig Ragsdale had Plaintiff step out of the car as a routine safety measure. Ragsdale Dec., ¶ 4; Trivette Dec., ¶ 4. Upon exiting the vehicle, the following exchange occurred between Plaintiff and the officers:

| | |
|---|---|
| Officer Ragsdale: | Do you have any weapons or anything on you? |
| Plaintiff: | No. |
| Officer Ragsdale: | Nothing illegal on you? Don't reach in your pocket. |
| Plaintiff: | No. |
| Officer Ragsdale: | Do you have anything illegal on you? |
| Plaintiff: | No. |
| Officer Ragsdale: | Do you care if I search you? |
| Plaintiff: | Sure. |
| Officer Ragsdale: | Keep your hands back here. Here. Just walk back here to the car, man. I haven't searched him yet. Right here in front. |
| Officer Dukes: | Alright, brother. Have you got any weapons on you? |
| Plaintiff: | No. |
| Officer Dukes: | Do you care if I pat you down? |
| Plaintiff: | Sure. |

| | | |
|---|---|---|
| Officer Dukes: | Okay. | |
| Officer Ragsdale: | He's already given us consent to search. | |
| Officer Dukes: | His person? | |
| Officer Ragsdale: | Yeah. | |
| Officer Dukes: | I was making sure he didn't have no weapons on him. This is a torch right here. | |
| Plaintiff: | (Inaudible.) | |
| Officer Dukes: | Anything in your pockets that stab? | |
| Plaintiff: | No. | |
| Officer Dukes: | No rigs in the car? | |
| Plaintiff: | Huh-uh. | |
| Officer Ragsdale: | Just take your hands and put them up here, like that. | |
| Officer Dukes: | Is this a meth pipe? He's got a pipe. Put your hands on your head. | |

Docket No. 76-8, Transcript of Excerpts of Body Camera Video Recordings ("Video Tr.") at 2:1-25; 3:1-14.

Officer Dukes performed the actual pat-down search. Trivette Dec., ¶ 4; Dukes Dec., ¶¶ 4, 5. The pat-down search revealed a "torch"-style lighter in Plaintiff's right front pocket, and a meth pipe in his left front pocket. *Id.*, ¶ 5; Ragsdale Dec., ¶ 5. The pipe had a visible white cloudy residue and burn mark. *Id.* Plaintiff was immediately handcuffed and placed under arrest due to the illegal paraphernalia found on his person. *Id.* Plaintiff admitted that he did not object to the pat-down search as it was happening. Plaintiff's Dep., at 43:4-7.

During the initial pat-down, Defendant Trivette was in his patrol car and did not personally participate in the search that revealed the drug paraphernalia in Plaintiff's pocket. Ragsdale Dec., ¶ 7.

Officer Dukes performed a further pat-down search of Plaintiff incident to arrest. Trivette Dec., ¶ 7, Dukes Dec., ¶ 6. Initially, Plaintiff was not compliant with the Officer's command to spread his legs but did spread them wider after several requests. *Id.* Officer Dukes felt something hard in between Plaintiff's legs, and asked Plaintiff several times what the object was. *Id.* Plaintiff denied that he had anything in his pants. *Id.* During this encounter, Plaintiff was clenching his

buttocks and reaching back while handcuffed, attempting to adjust his pants. *Id.* Officer Dukes and Defendant Trivette warned Plaintiff that he was going to Jail and that any contraband he brings into the facility could be charged as a felony. *Id.*

Defendant Trivette also performed a secondary pat-down search and confirmed that Plaintiff was clenching his buttocks, attempting to conceal something. Trivette Dec., ¶ 7. Despite several warnings, Plaintiff still denied that he had anything in his pants and was placed in the back of Defendant Trivette's patrol car for transport to the Putnam County Jail. *Id.*

While in transport to the Putnam County Jail, Defendant Trivette observed Plaintiff arching his back to raise his buttocks off the seat and reaching around as if to readjust something in his pants. *Id.*, ¶ 9. Defendant Trivette instructed Plaintiff multiple times to "stop reaching around." *Id.* These events caused Defendant Trivette to suspect that Plaintiff was concealing contraband in his buttocks region, and he informed corrections deputies of his suspicion so that Plaintiff would not be booked into the Jail population with the contraband still concealed on his person. *Id.*, ¶ 11.

After Plaintiff again denied that he was concealing anything, Officer Dukes and Defendant Trivette observed corrections deputies perform a strip search of Plaintiff in a private room. *Id.* During the strip search, Plaintiff refused to spread his buttocks completely and was obviously clenching his buttocks when instructed to squat and cough. *Id.*; Dukes Dec., ¶ 8. Officer Dukes observed a small corner of something that looked like plastic packaging protruding from Plaintiff's clenched buttocks. *Id.* Because the packaging was barely visible, the Officers suspected that Plaintiff had concealed the contraband in his rectum. *Id.* The Officers decided that the best course of action was to obtain a search warrant instead of trying to retrieve anything manually during the strip search. *Id.* Officer Dukes prepared the affidavit in support of the search warrant based on his personal knowledge of the events that occurred that night/morning and Defendant Trivette's

description of what he observed in making the initial stop and in the back of his patrol car on the way to the Jail. *Id.* Officer Dukes went to present the warrant to Putnam County Criminal Court Judge Wesley Bray, while Defendant Trivette stayed at the Jail and supervised Plaintiff. *Id.*

Officer Dukes obtained a warrant issued by Judge Bray, which commanded "an immediate search of the body and body cavities, not excluding the mouth, genitals, or any cavity of Brandon Luke Jones," to take place at the emergency room sector of Cookeville Regional Medical Center, conducted by and under the supervision of the medical professionals employed there. Dukes Dec., ¶ 9; Trivette Dec., ¶ 12. Defendant Trivette transported Plaintiff to the Cookeville Regional Medical Center Emergency Room as directed by the warrant. *Id.*

Defendant McLerran is a physician licensed to practice medicine in Tennessee and has been licensed and continuously practicing in the State since 2004. Docket No. 70-4, Affidavit of Samantha McLerran, M.D., ("McLerran Aff."), ¶¶ 2, 7. Defendant McLerran earned her medical degree from Meharry Medical College in 2001, was licensed to practice medicine in Kentucky from 2003-2005, completed a residency in 2004 through the Glasgow Family Medicine Residency program at the University of Louisville, is board certified in family medicine and emergency medicine, and is a fellow of the American Academy of Family Physicians. *Id.*, ¶¶ 3, 4, 5, 6. Defendant McLerran currently works at Cookeville Regional Medical Center; teaches advanced trauma life support to physicians, nurse practitioners, and physicians' assistants for the University of Tennessee; and sits on the Tennessee Board of Medical Examiners, representing Family Medicine practitioners. *Id.*, ¶¶ 8, 9. Apart from the instant suit, Defendant McLerran has never been sued for any alleged violation of any state or federal law, and she has never been the subject of a peer-review investigation, nor has she lost her privileges to practice at any health care facility. *Id.*, ¶¶ 10, 11, 12.

In medical school, Defendant McLerran received training on safe, hygienic techniques for performing digital rectal examinations over dozens of weeks, including in her internal medicine, general surgery, family medicine, and gastrointestinal rotations. *Id.*, ¶ 13. In the three years of her residency training, she estimates that she performed digital rectal examinations at least three times per week to every other day. *Id.*, ¶ 14.

Defendant McLerran teaches safe, hygienic techniques for performing digital rectal examinations in her advanced trauma life support training for physicians, nurse practitioners, and physicians' assistants for the University of Tennessee. *Id.*, ¶ 15. Rectal examinations are recommended evaluations for many abdominal, gynecological, and gastrointestinal complaints seen in the emergency department and by family-medicine practitioners. *Id.*, ¶ 16. Defendant McLerran regularly performs rectal examinations for both men and women as part of her practice to search for evidence of various disease processes. *Id.* She also has experience performing digital rectal examinations to search for and remove foreign bodies, including illegal drugs. *Id.*

The Cookeville Regional Medical Center emergency room sees an average of 120-140 patients per day, and Defendant McLerran estimates that she performs digital rectal examinations on one patient per day. *Id.* She has worked approximately 13 shifts per month for the last decade. *Id.* She therefore estimates that, over the course of her career, she has performed approximately 1,000 safe, hygienic digital rectal examinations of her patients. *Id.*

Aside from x-rays, CT scans, and digital examinations, the only other option for examining the interior of a human rectum is the use of an anoscope, an instrument like the speculum used in vaginal examinations. *Id.*, ¶ 17. The use of an anoscope is much more invasive than a digital rectal examination because of the risk that the anoscope instrument will push a foreign body further into a patient's rectum. *Id.* Digital rectal examinations can be uncomfortable for a patient, particularly

if the patient clenches the sphincter muscles, but a digital examination allows a physician to feel foreign objects and/or other pathologies inside the patient's rectum in a minimally invasive way, relative to an anoscope. *Id.*

A digital rectal examination poses more danger to a physician than to a patient due to, for example, the presence of an obscured sharp object. *Id.*, ¶ 18.

Based on Defendant McLerran's medical training and experience, she is familiar with the risks that accompany "body packing," which is the practice of hiding drugs in anatomical cavities, such as the mouth, rectum, intestine, ear, and vagina. *Id.*, ¶ 19. The rectum allows for rapid absorption of drugs and a ruptured pack of illegal drugs in the rectum can easily exceed the lethal dose by several times for human beings. *Id.* Pack rupture is a known cause of sudden death due to overdose and is one of the most serious complications that can accompany body packing. *Id.* Body packing can also cause other serious complications, including bowel obstruction, hemorrhage, and intestinal perforation. *Id.*

Based on her medical training and experience, Defendant McLerran is familiar with the proper evaluation of patients suspected of having drugs packed in the rectal cavity. *Id.*, ¶ 20. It is medically necessary when evaluating for suspected body packing to perform both a digital rectal examination and an x-ray. *Id.* A finger can only reach so far into a person's rectum, so an x-ray is a necessary complement to examine areas a finger cannot reach. *Id.* Similarly, an x-ray alone is not conclusive because loose powdery substances can be radiotranslucent, meaning that the substances may not be visible on x-ray film. *Id.*

Based on her medical training and experience, Defendant McLerran is familiar with the proper technique for performing digital rectal examinations. *Id.*, ¶ 21. Rectal examinations require the buttocks to be spread apart for a visual examination of the anus, posterior perineum, and gluteal

folds. *Id.* Then, the clinician uses a gloved index finger lubricated with water-based lubricant to advance the index finger through the sphincter and into the rectum. *Id.* There is no medical or scientific need to use any other disinfectant because the rectum is not a sterile area of the human body. *Id.* Sphincter muscles are naturally tightened to prevent incontinence, so some degree of force is required to pass the index finger through the sphincter and into the rectum to complete the examination. *Id.* Once inside the rectum, the clinician rotates the index finger to palpate all walls of the rectum. *Id.* To palpate the rectal walls, the clinician first rotates the finger clockwise from the 6 o'clock position to the 12 o'clock position and back to the 6 o'clock position. *Id.* The clinician then repeats the rotation in the counterclockwise direction. *Id.*

Upon transporting Plaintiff to the Cookeville Regional Medical Center Emergency Room, the signed search warrant was presented to the attending physician, Samantha McLerran, M.D., who was informed that Plaintiff was suspected of concealing illegal drugs in his rectum. Dukes Dec., ¶ 10; Trivette Dec., ¶ 13, McLerran Aff., ¶¶ 22, 23. Defendant McLerran observed Plaintiff walking abnormally with his knees pressed together upon arrival. McLerran Aff., ¶ 22.

After being presented with the signed search warrant, Defendant McLerran conferred with the hospital's attorney, who informed her that it was permissible under Tennessee statute to proceed with the requested body cavity search. *Id.*, ¶ 24. The hospital's attorney did not identify or warn her of any potential constitutional claims connected to the search. *Id.* Defendant McLerran is not trained in law and relied in good faith on the hospital's attorney's advice, together with the warrant signed by a judge, to proceed with the examination. *Id.*

Plaintiff was taken to room 233, which is the private patient room furthest from all other patients in the department at the time. *Id.*, ¶ 25. Plaintiff was shackled to the bed. *Id.* At all times relevant, the police officers, scribe, and nurse were present. *Id.*, ¶ 28. Also at all times relevant,

the door to Room 233 was closed to ensure Plaintiff's medical privacy. *Id.*, ¶ 29.

All examination rooms at the Cookeville Regional Medical Center are cleaned and turned over between every patient, including clean bed sheets. *Id.*, ¶ 26. Room 233 had been cleaned and turned over before Plaintiff was taken there. *Id.*

Defendant McLerran uses hand sanitizer before entering every room for every patient visit. *Id.*, ¶ 27. Consistent with this practice, she used hand sanitizer before entering Plaintiff's room. *Id.*

Defendant McLerran used her medical training and experience to evaluate and examine Plaintiff. *Id.*, ¶ 30. She began her evaluation by speaking with the Officers who reported that Plaintiff was suspected of having inserted drugs into his rectum. *Id.*, ¶ 31. She also spoke with Plaintiff, who denied having any illegal drugs on his person. *Id.*

No Officers personally instructed Defendant McLerran on how to perform the search authorized by the warrant. Dukes Dec., ¶ 10; Trivette Dec., ¶ 13; Docket No. 76-2, Declaration of Samantha McLerran, M.D., ("McLerran Dec."). ¶ 3. Defendant McLerran was in charge of the means, methods, and procedures to be used to conduct the search authorized by the warrant, and the Officers deferred to her medical judgment in that regard. *Id.* No Officers made or participated in the decisions regarding the means, methods, or procedures used to perform the search—those were Defendant McLerran's medical decisions. *Id.* Defendant McLerran did not ask for the Officers' input on how the search should be performed, and the Officers did not discuss it with her. *Id.*

Defendant McLerran told Plaintiff that she had nothing to do with the reasons that he was in custody, and that she was there to help search for contraband as authorized by the warrant. Dukes Dec., ¶ 11; Trivette Dec., ¶ 14; McLerran Aff., ¶ 32. She explained to Plaintiff that he could die if a bag of illegal drugs ruptured inside his body. Dukes Dec., ¶ 11; Trivette Dec., ¶¶ 14, 16; McLerran Aff., ¶ 32.

16

Defendant McLerran first conducted a review of systems and a physical examination of Plaintiff, which included, among other things, inspecting Plaintiff's abdomen, and listening to his heart, lungs, and bowels. McLerran Aff., ¶ 33. As part of the physical examination, Defendant McLerran performed a visual inspection of Plaintiff's buttocks area. *Id.*, ¶¶ 34. Plaintiff rolled over onto his side, was covered with a sheet, and pulled his pants down to expose his buttocks. *Id.* Plaintiff did not resist being rolled over or pulling his pants down. *Id.*

Defendant McLerran proceeded with the initial search. Dukes Dec., ¶ 12; Trivette Dec., ¶¶ 14, 15, 17. Defendant McLerran's hands were gloved and lubricated, and the ordinary digital anal cavity search only lasted a few seconds. McLerran Aff., ¶ ¶ 39-47; Trivette Dec., ¶ 17. Defendant McLerran lifted Plaintiff's right buttock. McLerran Aff., ¶ 36. Plaintiff resisted by clenching his buttocks. *Id.* Defendant McLerran found a bag of powdery substance in Plaintiff's gluteal cleft. *Id.* The powdery substance was very poorly wrapped in a sandwich-type bag and sealed with rubber bands and scotch tape. *Id.* There was a high risk of this bag spilling its contents or breaking open. *Id.*

Normally, in Defendant McLerran's professional experience, persons who secret illegal drugs inside their person seal the contraband multiple times by wrapping the contraband itself first, sealing it with duct tape, sealing it again in a Ziploc bag, and sealing it with duct-tape again. *Id.*, ¶ 37. Upon finding a very poorly wrapped bag of powdery substance in Plaintiff's gluteal cleft, Defendant McLerran became very worried about the presence of loose or poorly wrapped illegal drugs inside his rectum and the significant risk of lethal overdose. *Id.* She explained to Plaintiff that she was going to proceed with a safe, hygienic digital rectal exam. *Id.,* ¶ 38. Plaintiff requested an x-ray in lieu of a digital exam. *Id.* Defendant McLerran again explained the risk of a bag of illegal drugs rupturing inside his body, including the possibilities of overdose and death, and also

explained that an x-ray alone would not be sufficient to minimize the risks. *Id.*

Defendant McLerran proceeded with a safe, hygienic digital exam of Plaintiff's rectum. *Id.*, ¶ 39. She put on gloves and applied a water-based lubricant. *Id.* Defendant McLerran has small fingers and hands, wearing a size 6.5 surgical glove, which is the smallest size available in the Cookeville Regional Medical Center emergency room. *Id.*

Defendant McLerran's gloved, lubricated index finger entered Plaintiff's rectum at the 6 o'clock position. *Id.*, ¶ 40. When her finger penetrated Plaintiff's rectum, he did not react verbally or indicate pain or discomfort in any way. *Id.*, ¶ 41.

Consistent with standard clinical practice, Defendant McLerran first rotated her hand clockwise to the 12 o'clock position, then counterclockwise back to the 6 o'clock position. *Id.*, ¶ 42. She then rotated her hand counterclockwise to the 12 o'clock position and clockwise back to the 6 o'clock position. *Id.* Plaintiff again resisted by clenching his buttocks. *Id.*

When Defendant McLerran finished her examination, Plaintiff was covered with a sheet to protect his bodily privacy. McLerran Aff., ¶ 45. Emergency-department physicians do not, as a matter of standard practice assist the patient with cleanup after a digital rectal examination; such assistance is a standard nursing practice. *Id.*, ¶ 46.

Although some degree of force is necessarily required to pass through the sphincter and into the rectum, Defendant McLerran did not push hard or shove with her hand or index finger. *Id.*, ¶ 43. She did not conduct any portion of the examination to inflict gratuitous pain or punish Plaintiff. *Id.,* ¶ 52. Throughout the visual examination, digital rectal examination, or x-ray, Plaintiff did not spit, curse, yell, scream, or cry. *Id.*, ¶ 50. In fact, Defendant McLerran does not recall Plaintiff saying anything at all during the digital rectal examination other than denying that he had any illegal drugs on his person. *Id.*, ¶ 51.

18

Defendant Trivette was standing on the opposite side of the gurney and held Plaintiff's right knee as Defendant McLerran proceeded with the search, and he does not recall Plaintiff reacting, crying out, or indicating that he was experiencing any discomfort. *Id.*, ¶¶ 14, 17. Defendant McLerran pulled out plastic bag containing several grams of methamphetamine, which she handed to Defendant Trivette, who placed it in an evidence bag. *Id.* No other contraband was revealed, and Plaintiff was transported back to the Putnam County Jail. *Id.*, ¶ 17; McLerran Aff., ¶ 44. When Plaintiff left the hospital, he was walking normally, in contrast to the knees-together manner in which he walked into the hospital on arrival. McLerran Aff., ¶ 54.

The digital rectal examination was medically necessary, and Defendant McLerran conducted the examination appropriately and in accordance with her medical training and experience. *Id.*, ¶ 47. Defendant McLerran also ordered an x-ray of Plaintiff's abdomen. *Id.*, ¶ 48. An x-ray technician performed the x-ray while Plaintiff was still in Room 233. *Id.* The x-ray did not reveal any foreign objects inside of Plaintiff's rectum. *Id.* The x-ray was medically necessary under the circumstances for the reasons already discussed. *Id.*, ¶ 49. The examinations—in technique and scope—were consistent with the warrant presented to Defendant McLerran by law enforcement, her medical clinical training and experience, her observations of a poorly wrapped bag of a powdery substance in Plaintiff's buttocks area, and the significant risks of overdose and/or sudden death posed by body packing. *Id.*, ¶¶ 52, 53.

At the time of the traffic stop, Plaintiff was carrying approximately 6 grams of methamphetamine, which he hid down his pants, between his buttocks, upon being pulled over. Plaintiff's Dep., at 22:3-19; 41:9-14. Plaintiff testified that during the strip search, he did not spread his buttocks "as good as they wanted me to." *Id.*, at 56:16-24. Plaintiff also testified that during the strip search, he had an opportunity to give up the drugs he was concealing, but he just chose not to do it. *Id.*, at

52:18-22.

Plaintiff testified that Defendant Trivette did not participate in the actual cavity search; he just held Plaintiff's right leg and took the evidence from Defendant McLerran. *Id.,* at 37:18-23. Plaintiff further testified that he did not have any evidence that Defendant Trivette did anything in connection with the cavity search other than hold his right leg. *Id.*, at 39:11-18.

Plaintiff was imprisoned in connection with the charges arising out of the events of this traffic stop after a bond revocation hearing on or about August 19, 2019, and he remained in jail until he was released in June 2021. *Id.*, 32:3-25; 33:1-12, 25; 34:1-8.

On November 12, 2019, Plaintiff took a plea bargain deal and pled guilty to two meth-related felonies arising out of events that occurred on August 24, 2017 and December 11, 2018, in exchange for the State's agreement to dismiss the charges arising out of the events of July 28-29, 2019, which were dismissed the following day, November 13, 2019. *Id.*, at 102:24-25; 103:1; Plea Agreement; General Sessions Judgments in Case No. 19-CR-2530.

### III.  Law and Analysis

#### A.      Local Rules 56.01(c) and (g)

Local Rules 56.01(c) and (g) state, in pertinent part:

> **c.  Response to Statement of Facts.**  Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either (i) agreeing that the fact is undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii)  demonstrating that the fact is disputed.  Each disputed fact must be supported by a citation to the record. ...
>
> . . .
>
> **g.  Failure to Respond.**  Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for the purposes of summary judgment.

Plaintiff has filed a Response to Defendant McLerran's Motion for Summary Judgment

but has not responded to that of Defendant Trivette. And Plaintiff has failed to respond to either Statement of Undisputed Material Facts.

Plaintiff's failure to respond indicates "that the asserted facts are not disputed for the purposes of summary judgment." Accordingly, there are no genuine issues as to any material fact and all that remains to be determined is whether Defendants are entitled to a judgment as a matter of law.

## B. Motion for Summary Judgment

It would be inappropriate to grant Defendants' Motions solely on the ground that Plaintiff has failed to properly respond. *See Stough v. Mayville Community Schools*, 138 F.3d 612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

[A] district court cannot grant summary judgment in favor of the movant simply because the adverse party has not responded. The Court is required, at a minimum, to examine the movant's Motion for Summary Judgment to ensure that he has discharged [his initial] burden ... The federal rules require that the party filing a Motion for Summary Judgment "always bears the burden of demonstrating the absence of a genuine issue as to a material fact." *Id.* (citations omitted). The Court will, therefore, consider whether Defendants have met their burdens under the appropriate summary judgment standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.

Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).   In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273.  When this occurs, the moving party is entitled to summary judgment as a matter of law.  *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

Additionally, Fed. R. Civ. P. 56(c)(1) sets forth the requirement to support factual assertions as follows:

**(c) Procedures.**

**(1) *Supporting Factual Positions*.**  A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

22

**C.      42 U.S.C. § 1983**

Plaintiff alleges violations of his Fourth and Eighth Amendment rights pursuant to 42 U.S.C. § 1983.  Docket No. 28.  Section 1983 provides in part that, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331 (1986); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155 (1978)).  The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Id.* at 49, 108 S. Ct. 2255, *quoting United States v. Classic,* 313 U.S. 299, 326 (1941).

**D.      Qualified Immunity**

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Qualified immunity generally shields government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983).  The

right at issue "must have been articulated with a significant degree of particularity" (*Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989), so that it is sufficiently clear to a reasonable official that his or her conduct would violate the right at issue. Qualified immunity is available as long as the official's actions "could reasonably have been thought consistent with the rights [he or she is] alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The initial inquiry and threshold question, according to the Supreme Court, is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.*, *citing Siegert v. Gilley,* 500 U.S. 226, 232 (1991). If no constitutional right was violated, there is no necessity for further inquiry. *Id.*

A critical question is whether "any official in the defendants' position would understand that what he did violated those rights." *O'Brien v. City of Grand Rapids*, 23 F. 3d 990, 999 (6th Cir. 1994). Qualified immunity, therefore, "does not turn on the subjective good faith of the official; rather, it turns on the 'objective legal reasonableness' of his actions, assessed in light of the legal rules that were 'clearly established' at the time the actions were taken." *Id.,* quoting *Harlow*, 457 U.S. at 818-19. "If officers of reasonable competence could disagree on whether the conduct violated the plaintiff's rights," qualified immunity will apply. *Id.*, *quoting Grossman v. Allen*, 950 F. 2d 338, 341 (6th Cir. 1991)(citations omitted).

### E. The Case at Bar

### 1. Defendant Trivette

It is undisputed that, while Defendant Trivette was running Plaintiff's license plate in his patrol car, Officer Ragsdale asked Plaintiff to step out of the vehicle as a routine safety measure, and that once Plaintiff exited the vehicle, Officer Ragsdale asked Plaintiff for, and received, consent to search his person. Ragsdale Dec., ¶ 4. It is further undisputed that Officer Dukes

performed the actual pat-down search, but prior to doing so, Officer Dukes again asked Plaintiff for, and received, consent to search his person. Dukes Dec., ¶¶ 4, 5; Video Tr. at 2:1-25; 3:1-14. The law is well-settled that consent to search is an exception to the general warrant requirement, and a search pursuant to consent that is freely and voluntarily given does not violate the Fourth Amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Because it is undisputed that Plaintiff consented to the pat-down search, his Fourth Amendment rights were not violated.

Additionally, it is undisputed that Officer Dukes handcuffed Plaintiff after finding illegal drug paraphernalia in Plaintiff's pocket. Dukes Dec., ¶ 6. The law is also well-settled that once probable cause is established for an arrest, the officer may take the suspect into custody without violating the Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). While taking a suspect into custody, the officer may conduct a search incident to arrest. *U.S. v. Robinson*, 414 U.S. 218, 224-237 (1973). Moreover, it is undisputed that Defendant Trivette was in his patrol car and did not personally participate in the search that revealed the drug paraphernalia in Plaintiff's pocket. Ragsdale Dec., ¶ 7.

It is further undisputed that Officer Dukes obtained a warrant issued by Judge Bray, which commanded "an immediate search of the body and body cavities, not excluding the mouth, genitals, or any cavity of Brandon Luke Jones," to take place at the emergency room sector of Cookeville Regional Medical Center, conducted by and under the supervision of the medical professionals employed there. Dukes Dec., ¶ 9; Trivette Dec., ¶ 12. Defendant Trivette transported Plaintiff to the Cookeville Regional Medical Center Emergency Room as directed by the warrant. *Id.*

It is also undisputed that Plaintiff testified that Defendant Trivette did not participate in the actual cavity search; he just held Plaintiff's right leg and took the evidence from Defendant

McLerran. Plaintiff's Dep., at 37:18-23. Plaintiff further testified that he did not have any evidence that Defendant Trivette did anything in connection with the cavity search other than hold his right leg. *Id.*, at 39:11-18. Additionally, it is undisputed that throughout the visual examination, digital rectal examination, or x-ray, Plaintiff did not spit, curse, yell, scream, or cry. (McLerran Aff., ¶ 50), nor did Plaintiff react, cry out, or indicate that he was experiencing any discomfort (Trivette Dec., ¶ 17). Accordingly, Defendant Trivette's holding of Plaintiff's right leg was nothing more than a *de minimis* application of reasonable force and did not violate Plaintiff's constitutional rights.

Absent conduct violative of his constitutional rights, Plaintiff cannot sustain his §1983 claims and Defendant Trivette is entitled to a judgment as a matter of law.

Furthermore, it is undisputed that on November 12, 2019, Plaintiff took a plea bargain deal and pled guilty to two meth-related felonies arising out of events that occurred on August 24, 2017 and December 11, 2018, in exchange for the State's agreement to dismiss the charges arising out of the events of July 28-29, 2019, which were dismissed the following day, November 13, 2019. *Id.*, at 102:24-25; 103:1; Plea Agreement; General Sessions Judgments in Case No. 19-CR-2530. In light of the foregoing, to the extent that Plaintiff asserts any claims against Defendant Trivette related to the traffic stop, those claims are barred under the *Heck* doctrine, as Plaintiff's §1983 claims would render his plea bargain illusory and invalid, and habeas was available to redress those claims, such that this suit is an impermissible collateral attack on Plaintiff's state court conviction. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

## 2. Defendant McLerran

Turning to Plaintiff's claims against Defendant McLerran, it is undisputed that upon transporting Plaintiff to the Cookeville Regional Medical Center Emergency Room, the signed

search warrant was presented to Defendant McLerran as the attending physician; that she was informed that Plaintiff was suspected of concealing illegal drugs in his rectum and she observed him walking abnormally with his knees pressed together upon arrival; and that after being presented with the signed search warrant, Defendant McLerran conferred with the hospital's attorney, who informed her that it was permissible under Tennessee statute to proceed with the requested body cavity search. Dukes Dec., ¶ 10; Trivette Dec., ¶ 13, McLerran Aff., ¶¶ 22, 23, 24. The hospital's attorney did not identify or warn her of any potential constitutional claims connected to the search, and Defendant McLerran is not trained in law and relied in good faith on the hospital's attorney's advice, together with the warrant signed by a judge, to proceed with the examination. McLerran Aff., ¶24.

It is also undisputed that Defendant McLerran used her medical training and experience to evaluate and examine Plaintiff. *Id.*, ¶ 30. She began her evaluation by speaking with the Officers who reported that Plaintiff was suspected of having inserted drugs into his rectum. *Id.*, ¶ 31. She also spoke with Plaintiff, who denied having any illegal drugs on his person. *Id.*

Defendant McLerran told Plaintiff that she had nothing to do with the reasons that he was in custody, and that she was there to help search for contraband as authorized by the warrant. Dukes Dec., ¶ 11; Trivette Dec., ¶ 14; McLerran Aff., ¶ 32. She explained to Plaintiff that he could die if a bag of illegal drugs ruptured inside his body. Dukes Dec., ¶ 11; Trivette Dec., ¶¶ 14, 16; McLerran Aff., ¶ 32.

Defendant McLerran first conducted a review of systems and a physical examination of Plaintiff, which included, among other things, inspecting Plaintiff's abdomen, and listening to his heart, lungs, and bowels. McLerran Aff., ¶ 33. As part of the physical examination, Defendant McLerran performed a visual inspection of Plaintiff's buttocks area. *Id.*, ¶¶ 34. Plaintiff rolled over

onto his side, was covered with a sheet, and pulled his pants down to expose his buttocks. *Id.* Plaintiff did not resist being rolled over or pulling his pants down. *Id.*

Defendant McLerran proceeded with the initial search. Dukes Dec., ¶ 12; Trivette Dec., ¶¶ 14, 15, 17. Defendant McLerran's hands were gloved and lubricated, and the ordinary digital anal cavity search only lasted a few seconds. McLerran Aff., ¶¶ 39-47; Trivette Dec., ¶ 17. Defendant McLerran lifted Plaintiff's right buttock. McLerran Aff., ¶ 36. Plaintiff resisted by clenching his buttocks. *Id.* Defendant McLerran found a bag of powdery substance in Plaintiff's gluteal cleft. *Id.* The powdery substance was very poorly wrapped in a sandwich-type bag and sealed with rubber bands and scotch tape. *Id.* There was a high risk of this bag spilling its contents or breaking open. *Id.*

Normally, in Defendant McLerran's professional experience, persons who secret illegal drugs inside their person seal the contraband multiple times by wrapping the contraband itself first, sealing it with duct tape, sealing it again in a Ziploc bag, and sealing it with duct-tape again. *Id.*, ¶ 37. Upon finding a very poorly wrapped bag of powdery substance in Plaintiff's gluteal cleft, Defendant McLerran became very worried about the presence of loose or poorly wrapped illegal drugs inside his rectum and the significant risk of lethal overdose. *Id.* She explained to Plaintiff that she was going to proceed with a safe, hygienic digital rectal exam. *Id.*, ¶ 38. Plaintiff requested an x-ray in lieu of a digital exam. *Id.* Defendant McLerran again explained the risk of a bag of illegal drugs rupturing inside his body, including the possibilities of overdose and death, and also explained that an x-ray alone would not be sufficient to minimize the risks. *Id.*

Defendant McLerran proceeded with a safe, hygienic digital exam of Plaintiff's rectum. *Id.*, ¶ 39. She put on gloves and applied a water-based lubricant. *Id.* Defendant McLerran has small fingers and hands, wearing a size 6.5 surgical glove, which is the smallest size available in the

Cookeville Regional Medical Center emergency room. *Id.*

Defendant McLerran's gloved, lubricated index finger entered Plaintiff's rectum at the 6 o'clock position. *Id.*, ¶ 40. When her finger penetrated Plaintiff's rectum, he did not react verbally or indicate pain or discomfort in any way. *Id.*, ¶ 41.

Consistent with standard clinical practice, Defendant McLerran first rotated her hand clockwise to the 12 o'clock position, then counterclockwise back to the 6 o'clock position. *Id.*, ¶ 42. She then rotated her hand counterclockwise to the 12 o'clock position and clockwise back to the 6 o'clock position. *Id.* Plaintiff again resisted by clenching his buttocks. *Id.*

When Defendant McLerran finished her examination, Plaintiff was covered with a sheet to protect his bodily privacy. McLerran Aff., ¶ 45. Emergency-department physicians do not, as a matter of standard practice assist the patient with cleanup after a digital rectal examination; such assistance is a standard nursing practice. *Id.*, ¶ 46.

Although some degree of force is necessarily required to pass through the sphincter and into the rectum, Defendant McLerran did not push hard or shove with her hand or index finger. *Id.*, ¶ 43. She did not conduct any portion of the examination to inflict gratuitous pain or punish Plaintiff. *Id.*, ¶ 52. Throughout the visual examination, digital rectal examination, or x-ray, Plaintiff did not spit, curse, yell, scream, or cry. *Id.*, ¶ 50. In fact, Defendant McLerran does not recall Plaintiff saying anything at all during the digital rectal examination other than denying that he had any illegal drugs on his person. *Id.*, ¶ 51.

The digital rectal examination was medically necessary, and Defendant McLerran conducted the examination appropriately and in accordance with her medical training and experience. *Id.*, ¶ 47. Defendant McLerran also ordered an x-ray of Plaintiff's abdomen. *Id.*, ¶ 48. An x-ray technician performed the x-ray while Plaintiff was still in Room 233. *Id.* The x-ray did

not reveal any foreign objects inside of Plaintiff's rectum. *Id.* The x-ray was medically necessary under the circumstances for the reasons already discussed. *Id.,* ¶ 49. The examinations—in technique and scope—were consistent with the warrant presented to Defendant McLerran by law enforcement, her medical clinical training and experience, her observations of a poorly wrapped bag of a powdery substance in Plaintiff's buttocks area, and the significant risks of overdose and/or sudden death posed by body packing. *Id.,* ¶¶ 52, 53.

Because it is undisputed that Defendant McLerran appropriately conducted a medically necessary digital examination of Plaintiff's rectum, pursuant to a properly executed search warrant and out of concern for the risk of lethal overdose after finding a poorly wrapped bag of white powder in his gluteal cleft, Plaintiff cannot establish that she violated his constitutional rights and Defendant McLerran is entitled to a judgment as a matter of law.

## IV.  CONCLUSION

For the reasons discussed above, the undersigned finds that there are no genuine issues of material fact and that Defendants are entitled to a judgment as a matter of law. The undersigned therefore recommends that Defendants' Motions for Summary Judgment (Docket Nos. 70, 76) be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111

(1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**